MGD

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey Nielsen, et al., | No.  CV 20-01182-PHX-DLR (JZB) |
| Plaintiffs, | |
| v. | **ORDER** |
| David Shinn, | |
| Defendant. | |

Plaintiffs Jeffrey Nielsen and Brian Boudreau are prisoners incarcerated in a privately run prison under contract with the Arizona Department of Corrections, Rehabilitation & Reentry (ADCRR).  They, and Plaintiff Arizona State Conference of the National Association for the Advancement of Colored People ("Arizona NAACP"), have filed an "Amended Class Action Complaint for Declaratory and Injunctive Relief" (hereafter "First Amended Complaint" or FAC), on behalf of themselves and all others similarly situated, challenging the Arizona statutes authorizing ADCRR to contract with for-profit, private prisons in Arizona.  Named as Defendant in his official capacity is the current ADCRR Director, David Shinn.  Plaintiffs bring this putative class action on behalf of ADCRR prisoners who are or may be incarcerated in private prisons contracted with ADCRR.  In an Order dated March 8, 2021, the Court dismissed Plaintiffs' original Complaint with leave to file an amended complaint. (Doc. 37.)  On April 6, 2021, Plaintiffs filed their First Amended Complaint (FAC).  (Doc. 38.)

Before the Court is Defendant's Motion to Dismiss the FAC, which Plaintiffs oppose.[1] [2] (Docs. 41, 49.)  The Court will grant the Motion and terminate this action.

## I.      First Amended Complaint

Plaintiffs allege the following facts in the FAC.  Plaintiff Nielsen is incarcerated in the Arizona State Prison (ASP)-Phoenix West and Boudreau is confined in the ASP-Florence West, which are both private prisons owned by The GEO Group ("GEO") and under contract with ADCRR.  (Doc. 38 ¶¶ 8-9.)  Plaintiff Arizona NAACP is a nonprofit membership association and an umbrella organization for twelve branches and two youth councils; its mission is to ensure equal protection under the law for all persons, in particular African Americans and persons in the criminal justice system, including those confined in private, for-profit prisons.  (*Id.* ¶¶ 10-12.)   In 2012, the national NAACP adopted a resolution to abolish private prisons that was proposed and implemented by the Arizona NAACP.  (*Id.* ¶ 12.)  Part of the Arizona NAACP's core mission is the reduction of mass incarceration and the disproportionate impact of the criminal justice system on marginalized parts of the community, including people of color.  (*Id.* ¶ 14.)

Following conviction of certain crimes, the Superior Court of Arizona issues orders that sentence prisoners to specific punishments, including commitment to the custody of ADCRR as state prisoners; once committed to the custody of ADCRR, those persons become prisoners of the State of Arizona.  (*Id.* ¶¶ 45-46.)   ADCRR executes these sentencing orders by determining where each prisoner will be incarcerated and incarcerates prisoners in both public and private, for-profit prisons.  (*Id.* ¶ 47.)

Arizona law authorizes ADCRR to contract the entire operation of a prison to private, for-profit prisons.  (*Id.* ¶ 35 (citing Ariz. Rev. Stat. § 41-1609(B)).)   ADCRR

[1] Amicus Curiae briefs have been submitted by Florence Immigrant & Refugee Rights Project and American Immigration Lawyers (Doc. 55); LatinoJustice (Doc. 59); Center for Social Concerns at the University of Notre Dame, Faith in Action, Network Lobby, Georges Enderle, and Michael Hebbeler (Doc. 67); and Law Professors and Law Students from Arkansas (Doc. 71).

[2] The Court finds the Motion suitable for disposition without oral argument and Plaintiffs' request for oral argument is denied.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

contracts with private, for-profit prison corporations that operate prisons inside and outside of Arizona to currently incarcerate 20% or more of ADCRR prisoners, or approximately 7,500 people, "thereby delegating Arizona's sovereign power of incarceration and punishment to private vendors." (*Id*. ¶¶ 36, 51.)  The potential burden of replacing a prison contractor creates disincentives for ADCRR to closely monitor the prison contractors and sanction them for noncompliance, and conflicts with the safety, security, and welfare of prisoners and staff.  (*Id.* ¶¶ 75, 77.)   On information and belief, ADCRR does not adequately monitor its private prison contractors or sanction them for noncompliance with the contracts.  (*Id.* ¶ 76.)

ADCRR currently contracts with private, for-profit prison operators including GEO, CoreCivic, Inc. ("CoreCivic"), and Management and Training Corporation (MTC).  (*Id*. ¶ 37.)  CoreCivic, GEO and MTC are for-profit corporations with their principal offices in states other than Arizona.   (*Id*. ¶¶ 38-40.)  GEO and CoreCivic are public corporations whose stocks are traded on the New York Stock Exchange.  (*Id*. ¶ 41.)  ADCRR currently contracts with for-profit prison operators to incarcerate state prisoners in the following Arizona facilities: MTC's Marana Community Correctional Treatment Facility in Marana, Arizona; GEO's ASP-Florence West in Florence, Arizona, ASP-Kingman in Mohave County, Arizona, and Central Arizona Correctional Facility in Florence, Arizona; and CoreCivic's Red Rock Correctional Facility in Eloy, Arizona.  (*Id*. ¶ 44.)

ADCRR publishes requests for proposals to contract with private prison vendors and awards contracts under a competitive bidding process upon receipt of acceptable proposals from for-profit prison corporations.  (*Id*. ¶ 53.)  The terms of the contracts between ADCRR and private prison corporations govern placement and transfers of ADCRR prisoners to and from private prisons.  (*Id*. ¶ 54.)  The contracts also specify the types of ADCRR prisoners who may be incarcerated in private prisons and make the corporations responsible for the daily custody, control, incarceration, punishment, and well-being of each prisoner.  (*Id*. ¶¶ 54-55.)

Through ADCRR's public contracts with private prison vendors, ADCRR transfers the State of Arizona's sovereign power to incarcerate and punish prisoners in several ways:

a. ADCRR contracts with private for-profit prison corporations for multiple years and with multiple options to renew;

b. ADCRR delegates the power to incarcerate and punish, including full custody and control of prisoners;

c. ADCRR delegates the power to use force, including deadly force, against prisoners, and to strip search prisoners and seize property and take other invasive actions through staff that are not government law enforcement personnel;

d. ADCRR delegates the power to "write up" prisoners for incidents and activities that affect discipline, segregation, seclusion, privileges, work and pay, daily life and liberty within the prisons, early release time credits, the possibility of parole, and release from custody. Some private operators adopt facility policies that are not consistent with ADCRR policies, causing prisoners to be written up frequently for petty matters;

e. ADCRR delegates the power to decide the daily schedule of each individual prisoner, including sleep, recreation, meals, lights-out, location assignment within the prisons, and other activities;

f. ADCRR delegates the power to regulate access to religious services, clergy, prisoner contact with family members and attorneys, and education and training opportunities that may enable prisoners to reenter society successfully after serving their sentences and to gain early release credits based on education and other positive activities within prisons;

g. ADCRR guarantees 90-100% occupancy levels to some for-profit prison vendors, which financial guarantees influence, if not dictate, ADCRR decisions on prisoner placements and transfers;

h. Due to such occupancy guarantees, ADCRR fills private prison cells with a pre-determined number of ADCRR prisoners to avoid having to pay for empty private prison cells;

i. ADCRR enables private for-profit prison corporations to make profits for the corporations and their shareholders from the incarceration of prisoners, i.e., incarceration of prisoners is an ADCRR-authorized means of generating corporate profits by turning prisoners into economic assets for the corporations.

(*Id.* ¶ 56.)

The private, for-profit prison contract model creates incentives to increase corporate profits and corporate executive compensation under the ADCRR contracts by lowering costs to operate prisons; such cost-cutting measures conflict with safety, security, and the individual welfare of those within the private prisons.  (*Id.* ¶ 57.)  While the statutory scheme and some contracts with private prison operators purport to require ADCRR to oversee various aspects of the private prisons, that oversight is not regularly occurring or meaningful.  (*Id.* ¶ 58.)

Private prison corporations have profitability incentives to reduce programs and services, including recreation, education, job-training, health care, and food for prisoners.  (*Id.* ¶ 65.)  Private prison corporations earn billions of dollars in revenue annually; for example, CoreCivic reported $1.9 billion in revenue in 2020.  (*Id.* ¶ 66.)  The value of a private prison corporation's stock is materially affected by the number of prisoners it incarcerates, by projections of how many prisoners will be incarcerated and detained in its facilities, and by projections on further opportunities for growth.  (*Id*. ¶ 67.)  ADCRR's contracts to incarcerate people privately enhance the value of the prison corporations and the ability of the corporations to encourage investment and to borrow and expand.  (*Id.* ¶ 68.)  The relationship between stock value (as well as profits and salaries) and the number of human beings who have been commodified as assets creates a substantial conflict of interest between the for-profit prisons and the constitutional obligations of ADCRR and the constitutional rights of Plaintiffs and the Plaintiff class.  (*Id.* ¶ 69.)

The private prison corporations earn a profit by obtaining more assets in the form of commodified human beings, holding them for as long as possible, increasing the numbers incarcerated by them, taking actions to reduce the opportunity for parole or early release, and in reducing expenditures for medical and dental care, education, training, providing access to clergy and non-religious counselors, and recreation.  (*Id.* ¶ 70.)  Profits also incentivize private prison corporations to reduce the cost of workers by providing little training, education, and certification of staff, hiring the least expensive staff available, and

operating the prisons with the smallest number of workers possible, which can create dangerous and unhealthy conditions for prisoners and staff.  (*Id*.)

CoreCivic reported that in 2020 it earned a profit of $21.42 per "compensated man-day," which is defined as the revenue the corporation generates and expenses it incurs for "one offender for one calendar day."  (*Id*. ¶ 5.)  This profit represents a 24.4% margin.  (*Id*. ¶ 131.)  In a presentation to investors, CoreCivic touted "high recidivism" as a "positive investment characteristic" that helped make the corporation a "Unique Investment Opportunity."  (*Id*. ¶ 3.)

On January 26, 2021, President Biden issued Executive Order 14006 directing the U.S. Attorney General not to renew contracts with privately operated criminal detention facilities, stating that "[t]o decrease incarceration levels, we must reduce profit-based incentives to incarcerate . . . and ensure that our Nation's incarceration and correctional systems are prioritizing rehabilitation and redemption."  (*Id*. ¶ 81.)  The Executive Order explained that a 2016 report by the U.S. Department of Justice's Office of the Inspector General (OIG) found that "privately operated criminal detention facilities do not maintain the same levels of safety and security for people in the Federal criminal justice system or for correctional staff" and that private prisons "had higher rates of assaults, both by inmates on other inmates and by inmates on staff" and had "more frequent incidents of . . . uses of force [and] lockdowns."  (*Id*. ¶¶ 121-122.)

Placement in private prisons leads to longer terms of incarceration and increased recidivism because ADCRR delegates to private prisons the power to "write up" prisoners for incidents and activities that affect, for example, their early release time credits, the possibility of clemency, and release from custody; because of the incentives associated with longer terms of incarceration, prisoners in private prisons are generally written up more frequently and with more severe punishments.  (*Id*. ¶¶ 85-86.)  The operators of the Arizona private prisons, not ADCRR, are the true decisionmakers for whether a prisoner should be written up and the severity of any punishment, and "[t]o the extent ADCRR provides oversight over the decisions to write-up a prisoner for any alleged infraction, that

1    oversight is not meaningful.  Nor is there any opportunity to challenge a 'write up' or its

2    consequences." (*Id.* ¶¶ 87-88.)  On information and belief, ADCRR and the Arizona Board

3    of Executive Clemency make decisions affecting prisoners' lives and liberty that are

4    dependent on information reported by the private prison corporations. (*Id.* ¶ 89.)  The 2016

5    OIG report found that private prisons had more "guilty findings on inmate discipline

6    charges, and selected categories of grievances." (*Id.* ¶ 91.)  The same private prisons

7    corporations that Arizona uses were the subject of the OIG report. (*Id.*)

8              As a cost-cutting measure, the Arizona private prisons do not offer the same

9    programs offered in ADCRR public prisons, including educational, vocational,

10   rehabilitative, and religious programs, which leads to longer lengths of incarceration and

11   increased recidivism, or is expected to do so. (*Id.* ¶ 96.)  For example, ASP-Florence West

12   does not offer programs that are offered in ADCRR's public prisons through which some

13   prisoners may qualify for reductions in their sentences, and ASP-Florence West writes up

14   prisoners who do not work, causing or potentially causing those prisoners to serve more

15   time. (*Id.* ¶ 98.)  The more limited programs and services at Arizona private prisons cause

16   prisoners to be less prepared to successfully reenter society after serving their sentences,

17   leading to higher recidivism. (*Id.* ¶ 101.)

18             Arizona law and ADCRR do not require that private prison security officers meet

19   the training and certification standards of ADCRR corrections officers, and as a result have

20   less training and experience than ADCRR corrections officers, which affects safety and

21   security within the prisons. (*Id.* ¶ 107.)  On information and belief, private prison officers

22   lack civil service protections and grievance processes, which makes them more vulnerable

23   to pressure to violate or ignore rules to increase corporate profits. (*Id.*)

24             Private prisons under contract with ADCRR often have personnel running programs

25   for which they are not qualified and sometimes use teaching personnel as security guards

26   due to short staffing. (*Id.* ¶ 109.)  Private prison security personnel are generally paid less

27   than public corrections officers and do not have public employee pensions, which results

28   in higher turnover with correspondingly less-experienced and less-trained staff, and staff

shortages and difficulty recruiting personnel require private prison staff to more frequently work overtime and double shifts, which is not safe for staff or those incarcerated.  (*Id.* ¶¶ 110-111.)  These problems contribute to violence, which can lead to prisoners serving more time, more lockdowns, restrictions on prisoners' freedoms within the prisons, and loss of control.  (*Id.* ¶ 113.)  Private prisons experience greater levels of staff shortages than public prisons generally, causing lockdowns, less freedom, safety and security, and delays in providing food.  (*Id.* ¶ 115.)  Some private prisons do not discipline employees for fear of losing personnel.  (*Id.*)  Absence of control in a facility leads to chaos and tragedy, such as occurred during the riots in the privately operated Kingman prison.  (*Id.* ¶ 117.)  On information and belief, prisoners in Arizona private prisons experience greater deprivations of liberty and safety compared to prisoners in public prisons due to higher levels of incident reporting, violence, lockdowns, and serving more of their sentences, while under the supervision of less trained and experienced security staff.  (*Id.* ¶ 119.)  While public corrections officers take loyalty oaths to uphold the Constitution and to protect and serve, the first loyalty of private security guards is to their corporate prison employers and they are not agents of the state.  (*Id.* ¶ 118.)

Under the contracts with the private prison operators, ADCRR sets a per diem price for incarcerating an ADCRR prisoner, thereby "monetize[ing] each prisoner by making each prisoner a unit of revenue and profit to the Private Prison Corporations."  (*Id.* ¶ 124.)  ADCRR's contracts to incarcerate prisoners are assets of the private prison corporations that the corporations use to entice investments and as collateral to borrow and grow their businesses, and in that sense, ADCRR "enables private prison corporations to commodify human beings just as private jails in the nineteenth-century South commodified slaves."  (*Id.* ¶¶ 125-126.)  The value of those jails and the economic reputation of the jails' owners was tied to how many slaves they incarcerated.  (*Id.* ¶ 126.)  ADCRR tolerates substandard contract performance from private prison corporations, which adversely affects prisoners.  (*Id.* ¶ 127.)

Defendant Shinn is responsible for protecting the rights of persons committed to

ADCRR's custody, and Defendant's actions have monetized each prisoner ADCRR commits to private prisons by, among other things, paying the private prison corporations to punish prisoners through incarceration; setting the price it pays the private prison corporations for each day each prisoner is incarcerated; and guaranteeing specific volumes of prisoners for placement in private prisons.  (*Id.* ¶ 128.)  ADCRR's contracts with the private prison corporations are publicly procured through competitive bidding, thereby awarding through public auction the volume of prisoners' physical presence, custody, and control in prison cells.  (*Id.* ¶ 129.)  Mere possession and control of prisoners by prison corporations makes the prisoners valuable assets to the corporation, and they calculate their net profit from each day a prisoner is confined in their prisons.  (*Id.* ¶ 161.)

Each Plaintiff complained to ADCRR about his incarceration in private for-profit prisons as violative of the Constitution and sought transfer to public prisons or release.  (*Id.* ¶ 166.)  Defendant, or his predecessor, denied each Plaintiff's demand.  (*Id*. ¶ 167.)  Such denials constitute a uniform ADCRR policy that accords with state laws authorizing incarceration of ADCRR prisoners in private prisons.  (*Id*. ¶ 168.)

Defendant's placement of prisoners in privately operated prisons for profit violates the Constitution by substituting a prisoner-corporation relationship for a state-prisoner relationship; by relegating prisoners to the status of human inventory and making prisoners slaves to the private prison corporations; attenuating government protection, oversight, safety, and wellbeing of prisoners within the private prisons; and creating financial incentives to design and operate facilities that incarcerate more people for longer periods of time.  (*Id.* ¶ 170.)

Count One alleges an equal protection violation under the Fourteenth Amendment. Count Two alleges a substantive due process violation under the Fourteenth Amendment. Count Three alleges a procedural due process violation under the Fourteenth Amendment. Count Four alleges a violation of the Thirteenth Amendment's prohibition against slavery and involuntary servitude.  Count Five alleges a violation of the Eighth Amendment.

1    As relief, Plaintiffs seek a declaratory judgment that Arizona statutes authorizing

2    prison privatization are unconstitutional and that prison privatization and the resulting

3    contracts violate the United States Constitution.  (*Id*. at 50.)  Plaintiffs also seek an

4    injunction forbidding Defendant and his successors from placing prisoners in private

5    prisons and requiring Defendant to begin the process of discontinuing ADCRR's use of

6    private prisons.[3]  (*Id*.)  Plaintiffs seek their attorneys' fees and costs.  (*Id*.)

7    **II.    Federal Rule of Civil Procedure 12(b)(6)**

8    Dismissal of a complaint, or any claim within it, for failure to state a claim under

9    Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable

10   legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'"

11   *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting

12   *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).  In determining

13   whether a complaint states a claim under this standard, the allegations in the complaint are

14   taken as true and the pleadings are construed in the light most favorable to the nonmovant.

15   *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).  A

16   pleading must contain "a short and plain statement of the claim showing that the pleader is

17   entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But "[s]pecific facts are not necessary; the

18   statement need only give the defendant fair notice of what . . . the claim is and the grounds

19   upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation

20   omitted).  To survive a motion to dismiss, a complaint must state a claim that is "plausible

21   on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v.*

22   *Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff

23   pleads factual content that allows the court to draw the reasonable inference that the

24   defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Where the well-

25   pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

26   the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."

27   _____

28   [3] Plaintiffs also seek an order certifying the Plaintiff Class.  (Doc. 38 at 50.)  To certify a class, Plaintiffs must file a motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

1   *Id.* at 679.

2   As a general rule, when deciding a Rule 12(b)(6) motion, the court looks only to the

3   face of the complaint and documents attached thereto.   *Van Buskirk v. Cable News*

4   *Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner*

5   *& Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  If a court considers evidence outside

6   the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary

7   judgment.  *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).  A court may,

8   however, consider documents incorporated by reference in the complaint or matters of

9   judicial notice without converting the motion to dismiss into a motion for summary

10   judgment.  *Id.*

11   **III.   Discussion**

12   **A.   Facial or As-Applied Challenge**

13   Plaintiffs seek a declaratory judgment "that Arizona statutes authorizing prison

14   privatization are unconstitutional."  Plaintiffs' FAC specifically cites to Arizona Revised

15   Statutes §§ 41-1609(B) and 41-1609.01(F)-(G).  (*See* Doc. 38 ¶¶ 35, 193-194.)  Section

16   41-1609(B) provides:

> The department [ADCRR] may contract with any private or
> public institution that is located inside or outside this state for
> facilities or the operation of facilities that are dedicated to the
> confinement of persons who are committed to the department.
> Notwithstanding chapter 4, article 7 of this title and article 4 of
> this chapter, the contract may include a purchase option and if
> the contract has a per diem provision the contract may include
> a provision that allows a portion of the per diem to be applied
> to reduce the purchase price.

Section 41-1609.01(F) provides that a contract shall not be awarded to a private prison

operator unless the operator's proposal "substantially meets all of the requirements or

conditions set forth in this section and that meets all of the requirements in the request for

proposals." Section 41-1609.01(G) provides that a proposal "shall not be accepted unless the proposal offers cost savings to this state."[4]

Defendant argues that the FAC fails as a facial challenge to the statute because the FAC is "entirely speculative," relies on a series of presumptions to create one allegedly unconstitutional circumstance, and "cynically presumes" that a private facility is less safe and secure, does not adequately train and certify staff, engages in "sub-standard contract performance," and engages in cost-cutting measures that conflict with the welfare of those inside the prisons in order to increase profits and executive compensation. (Doc. 41 at 14.) Defendant argues an as-applied challenge to the statute also fails because Plaintiffs do not specifically allege that their constitutional rights are being violated because of their incarceration in one of Arizona's private facilities. (*Id.* at 15.)

Plaintiffs respond that what Defendant terms "presumptions" are simply the allegations in the FAC that must be accepted as true and that "[t]his is not an issue that the Court needs to or should resolve at this stage." (Doc. 49 at 29.) Plaintiffs contend they are challenging Arizona's system of privatized prisons, which is authorized by statute, and their claim "does not necessarily fit neatly into the 'facial' or 'as applied' bucket." (*Id.* at 29-30, citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges is not so well defined" and the distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint").)

Defendant replies that Plaintiffs have not even addressed the as-applied aspect of his argument and the Court should dismiss their as-applied challenge for failure to state a claim. (Doc. 75 at 2.) Defendant argues that Plaintiff's facial challenge must also be dismissed because their allegations "only suggest that the statue creates an *opportunity*" for private prison operators to violate their constitutional rights but they have not

---

[4] Plaintiffs also refer to the 2003 version of § 41-1609.01(G) and (K), which required the Arizona Office of the Auditor General to perform biennial audits of the private and public prison's respective costs. (Doc. 38 ¶ 194.) Plaintiffs allege that the first report issued in 2010 found that private prisons were slightly more expensive than public prisons, and the biennial audit requirement was eliminated after that. (Doc. 38 ¶¶ 195-196.)

established "that no set of circumstances exists under which the [statute] would be valid." (*Id.* at 3, quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987).)

A statute is facially unconstitutional if "'it is unconstitutional in every conceivable application, or [ ] it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.'"  *See Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984)) (omission in original).  "A facial challenge must fail where the statute has a plainly legitimate sweep."  *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008) (quotation omitted).  An "as-applied attack, by contrast, challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can "separate valid from invalid subrules or applications."  *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (quoting Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing,* 113 Harv. L. Rev. 1321, 1334 (2000)) and citing *Legal Aid Serv. of Oregon v. Legal Servs. Corp.,* 608 F.3d 1084, 1096 (9th Cir. 2010) ("Facial and as-applied challenges differ *in the extent to* which the invalidity of a statute need be demonstrated.") (quotation omitted)); *see also Davis v. Johnson*, 359 F. Supp. 3d 831, 863 (N.D. Cal. 2019) ("A successful challenge to the facial constitutionality of a statute invalidates the statute itself, whereas a successful as-applied challenge does not render the statute itself invalid but only the particular application of the statute.")(citing *Foti*, 146 F.3d at 635).

In *Salerno*, the Supreme Court found that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *Salerno*, 481 U.S. at 745.  The Supreme Court held that the fact that the statute at issue "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment."  *Id.*

Although Plaintiffs in this case are seeking to have the privatization statutes declared unconstitutional, they have not alleged facts supporting that the statutes are "unconstitutional in every conceivable application." *Foti,* 146 F.3d at 635. For example, Plaintiffs do not allege that provisions of the statutes requiring that private prison operators must demonstrate in their proposals "[t]he ability to comply with applicable correctional standards," "cost savings to this state," and "a level and quality of services that are at least functionally equal to those that would be provided by this state" are unconstitutional. *See* Ariz. Rev. Stat. § 41-1609.01(B)(2), (G) and (H). Nor do Plaintiffs take issue with statutory requirements that a contract with a private prison operator "shall not authorize, allow or imply a delegation of authority or responsibility to a prison contractor for" calculating inmate release dates, sentence credits, or placing prisoners under less restrictive custody or more restrictive custody or taking any disciplinary action. *See id*. § 1609.01(M)(1)-(4). And Plaintiffs do not contest the requirement that before entering into a contract with a private prison operator, the ADCRR director must determine "that the contractor will provide at least the same quality of services as this state at a lower cost or that the contractor will provide services superior in quality to those provided by this state at essentially the same cost." *Id*. § 41-1609.02(B).

Rather, Plaintiffs allege that these and other statutory provisions are not being followed by ADCRR and that private prisons generally lack oversight, resulting in constitutional violations. At best, the allegations in the FAC suggest an as-applied challenge. Yet, few of the allegations in the FAC are specific as to what is happening in Arizona's private prisons or to the two named prisoner Plaintiffs to adequately support an as-applied challenge. Among the allegations specific to Arizona are that private prisons in Arizona do not offer a cost savings to the state, that lack of control led to the riot at the privately operated prison in Kingman, Arizona, and that Defendant or his predecessor rejected the demands of the named Plaintiffs for transfer to a public prison or release. Other allegations specific to Arizona prisons are based on "information and belief," such as the allegations that ADCRR does not adequately monitor or sanction private prison contractors

or that prisoners in Arizona private prisons experience greater deprivations of liberty and safety compared to prisoners in public prisons due to higher levels of incident reporting, violence, lockdowns, and serving more of their sentences, while under the supervision of less trained and experienced security staff.  (Doc. 38 ¶¶ 76, 119.)

To the extent Plaintiffs have adequately asserted an as-applied challenge, Plaintiffs must still demonstrate standing to proceed with their claims.

**B.      Standing[5]**

"To establish standing a plaintiff must demonstrate: (1) the invasion of a legally-protected interest; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that the court can redress the injury by a favorable decision." *Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1094 (9th Cir. 1998) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).  "The standing requirement derives from Article III, Section 2 of the United States Constitution," which restricts adjudication in federal courts to "cases" and "controversies."  *Johnson v. Weinberger,* 851 F.2d 233, 235 (9th Cir. 1988).  A "case" or controversy" is found when a party demonstrates "it has suffered injury-in-fact which 'fairly can be traced' to acts or omissions of the [defendant]."  *Id.* (quoting *Simon v. E. Kentucky Welfare Rights Organ*., 426 U.S. 26, 41 (1976)).  For purposes of standing, an injury must be "'concrete and particularized,' as well as 'actual or imminent,'" and cannot be 'conjectural or hypothetical.'"  *Carney v. Adams*, — U.S. —, 41 S. Ct. 493, 498 (2020) (quoting *Lujan*, 504 U.S. at 560).

Standing will not be found "[w]hen '[s]peculative inferences' are necessary . . . to establish either injury or the connection between the alleged injury and the act challenged . . . ."  *Johnson*, 851 F.2d at 235 (quoting *Simon*, 426 U.S at 45).  Standing requires "a personal stake in the outcome of the controversy."  *Id.* (holding that the plaintiff's claim

---

[5] Because Defendant did not raise the issue of standing in its Motion, the Court, by Order dated November 3, 2021 (Doc. 76), required the parties to brief the issue because the Court is obligated to ensure that standing exists and to raise the issue sua sponte, if necessary. *San Francisco Drydock, Inc. v. Dalton,* 131 F.3d 776, 778 (9th Cir. 1997).

about United States strategic defense policy "only alleged hypothetical injury and generalized grievance," which was insufficient to confer standing).

### 1. Plaintiffs Nielsen and Boudreau

Defendant argues that Plaintiffs Nielsen and Boudreau lack standing because they have not alleged a concrete, particularized, and immediate injury, such as being forced to work, exposure to a substantial risk of serious harm, inability to challenge disciplinary determinations, or enduring prolonged sentences. (Doc. 77 at 3-4.) Defendant argues that Plaintiffs mount a general attack on the use of private prisons and rely on speculation that private operators may engage in unconstitutional conduct or have engaged in such conduct in non-ADCRR-contracted facilities in the past and that they may be harmed if the operators behave as they have alleged. (*Id*. at 4.)

Plaintiffs respond that being placed in a private prison is itself an injury sufficient to confer standing, in addition to the numerous concrete harms they have alleged prisoners in private prisons experience such as less safety and fewer trained staff, increased terms of incarcerations and recidivism, systemic bias from profit-motivated jailers, and commodification. (Doc. 78 at 3.) Plaintiffs argue that Nielsen and Boudreau meet all elements necessary for standing because their injuries are caused by placement in a private prison, which would be redressed by the sought declaratory and injunctive relief, including an injunction prohibiting prisoners from being placed in private prisons. (*Id*. at 4-5.) Plaintiffs also assert that a credible threat to a prisoner's physical wellbeing is sufficient to satisfy the injury requirement for standing. (*Id*. at 7.) They point to their allegations that on information and belief, conditions in Arizona private prisons are worse, are less safe and secure, that private prison security officers have less training and experience than ADCRR corrections officers, and that prisoners in private prisons experience greater deprivations of liberty and safety compared to prisoners in public prisons due to higher levels of incident reporting, violence, lockdown, and serving more of their sentences, while under the supervision of less trained and less experienced security staff. (*Id*. at 8, citing Doc. 38 ¶¶ 220, 120, 107, 119.) In addition, they cite their allegation that ASP-Florence

West, where Boudreau is incarcerated, does not offer programs that are offered in ADCRR public prisons, which allow some prisoners to qualify for sentence reductions. (*Id.*, citing Doc. 38 ¶ 98.)

In *Duke Power Company*, the Supreme Court found that appellees satisfied the requirements for standing by alleging they lived and worked in potentially dangerous proximity to nuclear power plants whose effects included non-natural quantities of radiation in the air and water, a sharp increase in the temperature of two lakes used to cool the reactor, threatened reduction in property values, and fear and apprehension about the effects of accidents and radiation on the appellees, their property, and their descendants. *Duke Power Co. v. Carolina Env'tl Study Grp., Inc.*, 438 U.S. 59, 73-74 (1978) (finding "injury in fact" in "several of the 'immediate [aesthetic and environmental] adverse effects [that] were found to harm appellees"). The Ninth Circuit has found that an environmental association and its members had standing to challenge the Bonneville Power Administration's offers of long-term contracts for power because the complaint contained allegations of the environmental consequences of the contracts, that the members lived in the Pacific Northwest, and one of its members was a resident of the region and a consumer of electric power there. *Forelaws On Board v. Johnson*, 743 F.2d 677, 680 (9th Cir. 1984). The Ninth Circuit has also held that threatened harm to "health, recreation use, and enjoyment" from the use of herbicides constitutes an impairment of a concrete interest. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994).

Here, the Court is satisfied that the prisoner Plaintiffs have standing to pursue their claims. They have a legally protected interest in being housed in a prison environment that is comparable to that of the state's public prisons, and they allege that interest is threatened by ADCRR housing them in private prisons because ADCRR does not provide sufficient oversight, staff are less trained, there is generally more violence in private prisons, and they may have fewer opportunities to obtain early release. This is sufficient to satisfy Article III's requirement that an injury "be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)

(quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted).  In addition, the Supreme Court has long said that when plaintiffs "demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement", they need not "'have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough.'"  *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593).  In addition, both prisoners allege they have requested to be transferred to a state prison and those requests were denied by the ADCRR Director, which supports they have, in fact, alleged an actual injury.  Moreover, there is a causal connection between the threatened injury and Defendant's conduct because ADCRR has contracted with private prisons and made the decision to house Plaintiffs in a private prison.  And the Court can likely redress the potential injury by a favorable decision that would prevent ADCRR prisoners from being housed in private prisons.

### 2.    Plaintiff Arizona NAACP

Defendant argues that Arizona NAACP does not have direct standing because the allegations fail to show a frustration of the organization's mission to ensure equal protection under the law for all persons.  (*Id*. at 5.)  Further, Defendant argues Arizona NAACP lacks associational standing because Plaintiffs do not allege that Nielsen and Boudreau are members of Arizona NAACP, the Supreme Court has rejected theories of associational standing that rely on a statistical probability that some members of an organization are threatened with concrete injury, and, because Plaintiff's facial challenge to the privatization statutes fails as a matter of law, participation of Arizona NAACP members would be necessary to establish the individual member's constitutional claims in an as-applied challenge.  (*Id*. at 9-10.)

Plaintiffs respond the Arizona NAACP has associational standing because placement in private prisons harms its members, and it is not necessary that a complaint identify its members to defeat a motion to dismiss.  (*Id*. at 9-10 and n.2.)  Plaintiffs further contend that individualized proof from members is not needed where declaratory and

injunctive relief is sought rather than monetary damages.  (*Id*. at 11.)  They also argue Arizona NAACP has direct organizational standing because private prisons in Arizona have diverted Arizona NAACP's resources and frustrated its mission because they have alleged Arizona NAACP dedicates its resources to educating the public about the harms and failures of private, for-profit prisons, advocates for persons incarcerated in private, for-profit prisons, lobbies before legislative bodies in opposition to prison and jail privatization, and participates in administrative proceedings to oppose prison privatization.  (*Id*. at 13-15.)

A "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—" is sufficient to confer direct (i.e., organizational) standing on an organization.  *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).  "[A]n organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the [effects of the particular law] in question."  *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).  An organization cannot, however, "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.  It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."  *Valle del Sol v. Whiting,* 732 F.3d 1006, 1018 (9th Cir. 2013) (citation and internal quotation omitted).

In this case, Plaintiffs allege that Arizona NAACP's mission is to ensure equal protection under law for all persons, particularly African Americans, and persons in the criminal justice system, including those in private, for-profit prisons, and that its members include those who have been or will be directly harmed by prison privatization.  Part of Arizona NAACP's core mission is the reduction of mass incarceration and the disproportionate impact of the criminal justice system on marginalized parts of the community, including people of color.  They allege that Arizona NAACP has been forced

1   continually to divert resources toward working to abolish prison privatization and advocate

2   for those members or members' friends and relatives incarcerated in for-profit prisons.

3       These allegations are sufficient to support that Arizona NAACP has suffered injury

4   in fact such that Arizona NAACP has standing.  *See E. Bay Sanctuary Covenant v. Barr*,

5   950 F.3d 1242, 1265 (9th Cir. 2020) ("We have read *Havens* to hold that an organization

6   has direct standing to sue where it establishes that the defendant's behavior has frustrated

7   its mission and caused it to divert resources in response to that frustration of purpose.")

8                    **3.   Prudential Concerns**

9       Defendants argue Plaintiffs lack standing because prudential limitations preclude

10  this Court from adjudicating generalized grievances and abstract, political controversies

11  such as systemic bias in the criminal justice system or societal problems with incarceration

12  and the use of private prisons.  (*Id.* at 11-12.)  Plaintiffs respond that they have asserted

13  more than a generalized grievance about government because they have a direct interest in

14  their placement in a private prison and they are only seeking to assert the rights of others

15  through the established class action procedures of Rule 23.  (Doc. 78 at 16-17 and n.5.)

16      The Supreme Court has kept the issue of Article III standing, which enforces the

17  Constitution's case-or-controversy requirement, separate from the issue of prudential

18  standing, "which embodies judicially self-imposed limits on the exercise of federal

19  jurisdiction.'"  *U.S. v. Windsor*, 570 U.S. 744, 756-77 (2013) (internal citations and

20  quotations omitted).  Rules of prudential standing "are more flexibles rules of federal

21  appellate practice . . . designed to protect the courts from deciding abstract questions of

22  wide public significance even when other governmental institutions may be more

23  competent to address the questions and even though judicial intervention may be

24  unnecessary to protect individual rights."  *Id.* (internal citations, quotations, and alterations

25  omitted).

26      In this case, the Court is satisfied Plaintiffs have prudential standing because they

27  are sufficiently aggrieved by their incarceration in, and the presence of, private prisons in

28  Arizona.  In addition, if they obtain the relief they seek, the prisoner Plaintiffs will no

longer be housed in a private prison in Arizona and Arizona NAACP will not be diverting resources to abolish private prisons in Arizona.  This is sufficient to create a justiciable dispute, as opposed to resolving public disputes, as required by Article III.  *See, e.g., Warth v. Seldin*, 422 U.S. 490, 500-501 (1975) (so long as a plaintiff alleges a "distinct and palpable injury to himself," even if the injury is shared by a large class of other possible litigants, they have standing "to seek relief on the basis of the legal rights and interests of others, and, indeed may invoke the general public interest in support of their claim").

### C.   Proper Defendant

Defendant argues in a footnote that he "does not appear to be the proper defendant in this action."  (Doc. 41 at 5 n.4, citing *Ex parte Young*, 209 U.S. 123, 157 (1908) (a defendant sued in his official capacity "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party") and *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) ("a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit").)   Plaintiffs respond that Defendant has far more than "general supervisory authority" and that Defendant's Motion notes that Defendant "is responsible for making determinations related to private prisons" and that the statutes grant Defendant authority to contract with private prison operators.  (Doc. 49 at 30 n.2, citing Doc. 41 at 2-3 and Ariz. Rev. Statute § 41-1609.02A.)

Defendant does not address the issue of the proper Defendant in his Reply, apparently conceding that he is a proper Defendant.  In addition, Defendant asserts in his Motion that in determining whether a private contractor meets statutory requirements, "the Director must consider security, inmate management and control, inmate programs and services, facility safety and sanitation, administration, food services, personnel practices and training, inmate health services, and inmate discipline."  (Doc. 41 at 2-3, citing Ariz. Rev. Stat. § 41-1609.02(B).)  That same section of the statute also requires that before entering into a contract with a private prison operator the ADCRR Director must determine

"that the contractor will provide at least the same quality of services as this state at a lower cost or that the contractor will provide services superior in quality to those provided by this state at essentially the same cost." *Id*. § 41-1609.02(B).  Based on these and other provisions of the statute, Defendant has "some connection with the enforcement of the act," *Ex parte Young*, 209 U.S. at 157, and, in his official capacity, is a proper Defendant.

### D.   Counts One and Two (Fourteenth Amendment Equal Protection and Substantive Due Process)

Plaintiffs allege in Count One that the disparate treatment of prisoners held in private prisons is presumptively unconstitutional, subject to heightened scrutiny, and violates the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 38 ¶ 185.)  Plaintiffs allege that mass incarceration falls disproportionately on people of color, prisoners in private prisons are not provided equal protection of law, and the statutes authorizing private prisons in Arizona do not bear a rational relationship to the stated purpose of cost savings.  (*Id.* ¶¶ 186-195.)

Plaintiffs allege in Count Two that Arizona laws authorizing and/or requiring that ADCRR contract with private vendors infringe on the Plaintiffs' liberty and their fundamental right not to be treated as a commodity, as property, or as a slave and thus deny Plaintiffs substantive due process.  (*Id.* ¶ 201.)  Plaintiffs further allege that the privatization statutes do not bear a rational relationship to the stated purpose of cost savings or any other legitimate state purpose, private prisons do not provide a cost saving, and the privatization statutes are irrational and/or plainly arbitrary.  (*Id.* ¶¶ 203-212.)

### 1.   Legal Standards

Under the Equal Protection Clause of the Fourteenth Amendment "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985).  The general rule regarding the validity of state legislation or other official action that is challenged as denying equal protection "is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to

a legitimate state interest." *Id.* at 440.  However, governmental action that discriminates on the basis of race, alienage, or national origin is reviewed, for equal protection purposes, under a "strict scrutiny" standard.  *Id.*

Convicted prisoners are not a protected or suspect class; thus a prison regulation that impinges on a convicted prisoner's constitutional rights is generally only subject to a "rational basis" review.  *See Wottlin v. Fleming*, 136 F.3d 1032, 1036–37 (5th Cir. 1998); *see also Thornburgh v. Abbott*, 490 U.S. 401, 404 (holding that the exigencies of prison administration require only that a subject regulation be reasonably related to a legitimate penological interest); *but see Hydrick v. Hunter*, 500 F.3d 978, 998-99 (9th Cir. 2007) (holding that certain fundamental interests, such as freedom from bodily restraint and personal security, are subject to heightened scrutiny, but that ordinarily a prisoner "cannot challenge the conditions of his confinement on equal protection grounds unless the discrimination against him is irrational or arbitrary"), *vacated and remanded on other grounds*, 556 U.S. 1256 (2009).  Generally, "[t]o state a claim . . . for a violation of the Equal Protection Clause . . . [,] a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

The Supreme Court has held that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (citation and quotation omitted).   The "Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

## 2.  Discussion

Defendant argues the Court has already ruled that strict scrutiny does not apply in this case and that the privatization statutes reflect legitimate state interests such as cost savings and equal to or better services.  (Doc. 41 at 12.)  Defendant contends the impact mass incarceration may have on people of color is irrelevant to Plaintiff's claim that the

1    privatization statutes discriminate between prisoners in private facilities and those in state-

2    operated facilities.  (*Id*. at 13.)  Defendant further argues that Plaintiffs have not alleged

3    that Defendant intentionally discriminates against prisoners in private facilities, which is

4    fatal to their equal protection claim.  (*Id*.)  Defendant cites to his argument in his prior

5    Motion to Dismiss that Plaintiffs cannot show that the privatization statutes are not

6    rationally related to legitimate governmental objectives.  (Doc. 7 at 15-16.)

7         Plaintiffs respond that the FAC states a claim even under rational basis review

8    because they allege that private prisons in Arizona do not provide a cost saving, are more

9    expensive than public prisons, and that the one audit performed showed that private prisons

10   were slightly more expensive than public prisons.  (Doc. 49 at 13, citing Doc. 38 ¶¶ 190-

11   195, Ex. H.)  Plaintiffs point to their allegation that after the first report found that private

12   prisons were more expensive than public prisons, the biennial audit requirement in the

13   original statute was eliminated, allowing the Legislature to "turn a blind eye" to whether

14   private prisons were saving money and depriving the public of the information.  (*Id*. at 13-

15   14, citing Doc. 38 ¶ 196.)  In response to Defendant's claim that the state has an interest in

16   private prisons providing equal to or better services, Plaintiffs point to their allegations that

17   private prisons have inferior staffing and private prison corporations have incentives to

18   operate their facilities to reduce programs and services, which makes prisoners less

19   prepared to reenter society, leading to higher recidivism.  (*Id*. at 14-15, citing Doc. 38

20   ¶¶ 105-22, 65, 101, 103.)

21        Plaintiffs further argue that Defendant has not explained why rational basis applies

22   in this case and they again argue that elevated scrutiny is necessary.  (*Id*. at 15-16.)

23   Plaintiffs argue that the Supreme Court's 2015 decision in *Obergefell* built on prior cases

24   "concluding there are certain interests that are sufficiently weighty that the 'rational basis'

25   test should not apply even when no fundamental right or suspect class is present."  (*Id*. at

26   16, citing *Obergefell v. Hodges*, 576 U.S. 644 (2015) and *Plyler v. Doe,* 457 U.S. 202

27   (1982).)  Plaintiffs argue they "have a fundamental right not to be commodified and, in

28

essence, turned into property" and that the full context of this case "shows a more searching inquiry is appropriate than what the ADCRR proposes."  (*Id.*)

Plaintiffs do not make a separate argument regarding their substantive due process claim or that Defendant violated the substantive component of the Due Process Clause by taking arbitrary or conscience shocking action against them.

Plaintiffs do not allege that the privatization statutes discriminate on the basis of race, alienage, or national origin such that it is subject to "strict scrutiny" review.  The only authority Plaintiffs have cited for their argument that the Court should apply heightened scrutiny is *Obergefell*, which involved the right to marry, and *Plyler*, which addressed the right of undocumented children to public education, and neither of those cases is analogous to the issue here.  Therefore, because convicted prisoners are not a protected or suspect class, the statute is subject to rational basis review, which means it is presumed to be valid and must be sustained if it is rationally related to a legitimate state interest.

As noted in the Court's prior Order, the privatization statute expressly states that a proposed contract "shall not be accepted unless the proposal offers cost savings to this state" and that it must offer "a level and quality of services that are at least functionally equal to those that would be provided by this state." Ariz. Rev. Stat. § 41-1609.01(G)-(H). Plaintiffs again appear to agree that cost savings are a legitimate state interest and have not alleged that the statute is not rationally related to this or any other legitimate purpose, only that one audit found the private prisons were slightly more expensive than state prisons. When the court applies a rational basis review to an equal protection claim, the court "do[es] not require that the government's action actually advance its stated purposes, but merely look[s] to see whether the government could have had a legitimate reason for acting as it did." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1141 (9th Cir. 2011 (quoting *Currier v. Potter*, 379 F.3d 716, 732 (9th Cir. 2004)).  The Supreme Court has made clear "that a broad range of governmental purposes and regulations satisfies these requirements" of legitimate state interests for purposes of the Fourteenth Amendment. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 (1987) (citing cases).

Because Plaintiffs' allegations do not support that Defendant has taken arbitrary or conscience shocking action or that the state privatization statutes are not rationally related to a legitimate state purpose, Plaintiffs have failed to state an equal protection or substantive due process claim and the Court will dismiss Counts One and Two.

### E.   Count Three (Fourteenth Amendment Procedural Due Process)

Plaintiffs allege in Count Three that Arizona laws that authorize and/or require that ADCRR contract with private vendors implicate important liberty interests, introduce a significant and unreasonable risk of improper infringement on those interests, and do not provide attendant efficiency to the government, in violation of Plaintiffs' procedural due process rights.  (Doc. 38 ¶ 216.)  Plaintiffs allege that assignment to an Arizona private prison imposes atypical and significant hardship on a prisoner in relation to the ordinary incidents of prison life, that conditions at Arizona private prisons are worse than in state-run prisons, with higher levels of incident reporting, violence, and lockdowns, while under supervision of less trained and experienced staff, and lead to increased terms of incarceration and increased recidivism, without sufficient procedural safeguards.  (*Id.* ¶¶ 219-224.)  Plaintiffs allege that the private prisons and their employees make decisions regarding matters that affect a prisoner's release date and ability to reenter society while having a financial incentive to keep them incarcerated longer and more frequently, which violates their procedural due process rights.  (*Id.* ¶¶ 225, 230-31.)

#### 1.   Legal Standard

The Fourteenth Amendment states, in relevant part, that no State shall "deprive any person of life, liberty, or property, without due process of law."  In analyzing a due process claim, a court must first decide whether a plaintiff was entitled to any process, and if so, whether he was denied any constitutionally required procedural safeguard.  Liberty interests that entitle a prisoner to due process are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical

and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).

"Atypicality" turns on the importance of the right taken away from the prisoner. *See Carlo v. City of Chino*, 105 F.3d 493, 499 (9th Cir. 1997); *see, e.g.*, *Sandin*, 515 U.S. at 472 (30 days disciplinary segregation is not atypical and significant); *Jacks v. Crabtree*, 114 F.3d 983 (9th Cir. 1997) (denial of year sentence reduction is not an atypical and significant hardship); *Torres v. Fauver*, 292 F.3d 141, 151 (3d Cir. 2002) (four months in administrative segregation is not atypical and significant); *Jones v. Baker*, 155 F.3d 810 (6th Cir. 1998) (two years in administrative segregation is not atypical and significant); *but see Serrano v. Francis*, 345 F.3d 1071, 1078-79 (9th Cir. 2003) (holding that the placement of a paralyzed prisoner in administrative segregation for two months without access to his wheelchair, a proper shower or toilet, exercise equipment, or other accommodations "worked an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life"). To determine whether sanctions are an atypical and significant hardship, courts look to a prisoner's conditions of confinement, the duration of the sanction, and whether the sanction will affect the duration of the prisoner's sentence. *See Keenan v. Hall*, 83 F.3d 1083, 1088-89 (9th Cir. 1996).

## 2.   Discussion[6]

Defendant argues that Plaintiffs have not provided any factual allegations supporting that Arizona's private prisons have higher levels of incident reporting and violence than state-operated facilities, and they have not alleged that prisoners in private facilities are not afforded any process to challenge disciplinary write ups. (Doc. 41 at 10-11.) Defendant also argues that even if Plaintiffs have stated a procedural due process claim, invalidating the state statute is not the appropriate remedy, and that Plaintiffs' failure to allege they have personally been denied procedural due process or been subjected to

---

[6] As in their Response to the first Motion to Dismiss, Plaintiffs assert that they are raising two procedural due process claims with the first challenging the decision to place an individual in a private prison and the second raising a "structural bias claim," which involves private prison decisions that affect the length of the prisoners' sentences. (Doc. 59 at 23, 26.)

"atypical and substantial [sic] conditions" destroys their as-applied challenge, as does the fact that prisoners can challenge disciplinary write-ups.  (*Id*. at 11.)

To the extent Plaintiffs are alleging that mere placement in a private prison violates due process, Defendant argues that argument is foreclosed by two Supreme Court cases and a Ninth Circuit case.  (*Id*. at n.6, citing *Olim v. Wakinekona*, 461 U.S. 238, 248 (1983) ("Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State."); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution," and the Constitution does not "guarantee that the convicted prisoner will be placed in any particular prison . . . ."); and *White v. Lambert*, 370 F.3d 1002, 1013 (9th Cir. 2004) (in a habeas action challenging the state of Washington's authority to transfer the petitioner from a Washington state prison to a private prison in Colorado, the court held that the prisoner's transfer "did not violate any independent substantive liberty interest protected by the Due Process Clause" despite the prisoner's claim that the transfer to a private prison was solely motivated by profit), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010).)

Plaintiffs respond that their allegations "plausibly suggest a liberty interest is implicated, even if a single factor taken alone might potentially not be sufficient."  (Doc. 49 at 24.)  As support, Plaintiffs point to the following allegations in the FAC, most of which were alleged in the original Complaint:

> • On information and belief, prisoners in Arizona private prisons experience greater deprivations of liberty and safety compared to prisoners in public prisons due to higher levels of incident reporting, violence, lockdowns, and serving more of their sentences, while under the supervision of less trained and experienced security staff.  (Doc. 38 ¶ 119.)
> • In short, Arizona private prisons are less safe and less secure simply because they are private.  When violence has

occurred in private prisons, the private operators have to call in ADCRR officers, because private prison staff are not able to handle such occurrences.  (*Id.* ¶ 120.)

- To save money and increase profits, the Private Prison Corporations are also incentivized in the operation of their facilities to reduce programs and services, including but not limited to recreation, educational and job-training opportunities, health care, and food.  They are similarly incentivized to reduce security." (*Id.* ¶ 65.)

- The relationship between stock value (as well as profits and salaries) and the number of human beings who have been commodified as asserts creates a substantial conflict of interest between the for-profit prisons on the one hand, and the constitutional obligations of ADCRR and constitutional rights of Plaintiffs and the plaintiff class on the other.  The effects of this system-embedded conflict of interest are often obscured in individual cases.  Thus, this conflict must be eliminated on a systemic basis.  (*Id.* ¶ 69.)

- For example, the private prison ASP-Florence West does not offer programs offered in ADCRR public prisons through which some prisoners may qualify for reductions in their sentences and writes up prisoners who do not work, cause or potentially causing such prisoners to serve more time.  (*Id.* ¶ 98.)

- The ADCRR delegates to private prisons the power [to] "write up" prisoners for incidents and activities that affects, among other things, their early release time credits, the possibility of clemency, and release from custody.  (*Id.* ¶ 85.)

One new allegation Plaintiffs cite is "[t]o the extent ADCRR provides oversight over the decisions to write up a prisoner for any alleged infraction, that oversight is not meaningful.  Nor is any opportunity to challenge a write up or its consequences."  (*Id.* ¶ 88.)  Plaintiffs argue that "[b]ecause the 'interplay' between all these factors 'implicates factual questions,' the due process claim cannot be decided in a motion to dismiss."  (Doc. 49 at 26, quoting *McKee v. Peoria Unified Sch. Dist.*, 963 F. Supp. 2d 911 (D. Ariz. 2013) (holding that the plaintiff, a teacher who had been terminated, stated a due process claim where he alleged the school board acted as both investigator and adjudicator during its investigation and hearing and that the board and its attorneys were biased, engaged in

1  impropriety, and had a pecuniary interest in the outcome of the hearing).)  Plaintiffs also

2  cite *Jackson v. Carey*, which found that "*Sandin* requires a factual comparison between

3  conditions in general population or administrative segregation (whichever is applicable)

4  and disciplinary segregation, examining the hardship caused by the prisoner's challenged

5  action in relation to the basic conditions of life as a prisoner."  353 F.3d 750, 755 (9th Cir.

6  2003) (holding that the prisoner plaintiff sufficiently alleged facts regarding material

7  differences between his administrative segregation conditions and the conditions he

8  suffered in the SHU to survive defendants' motion to dismiss).  Neither *McKee* nor *Jackson*

9  is helpful in the present case because both *McKee* and *Jackson* involved specific allegations

10  about the actual conditions of the prisons where the prisoner plaintiffs were incarcerated.

11      Plaintiff also cites *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005), a class action

12  alleging that the state's policy governing placement in the Ohio State Penitentiary (OSP),

13  a "supermax" prison, did not afford procedural due process.  The Supreme Court held that,

14  taken together, the conditions of confinement in the OSP, including the denial of almost all

15  human contact, the indefinite nature of confinement, and the fact that assignment to OSP

16  disqualified an otherwise eligible prisoner for parole consideration, imposed "an atypical

17  and significant hardship within the correctional context" and that the prisoners "have a

18  liberty interest in avoiding assignment to OSP."  *Wilkinson*, 545 U.S. at 224 (applying the

19  three-part framework for due process established in *Mathews v. Eldridge*, 424 U.S. 319

20  (1976) to find that Ohio's policy on placement in OSP "provides a sufficient level of

21  process").

22      In the prior Order granting Defendant's Motion to Dismiss, the Court found there

23  were no allegations similar to those in *Wilkinson* such that the Court could find that

24  Plaintiffs have a liberty interest in not being assigned to one of the private prisons under

25  contract with ADCRR.  (Doc. 37 at 20.)  In particular, the Court found that while Plaintiffs

26  alleged that private prison operators have the power to "write up" prisoners for incidents

27  that affect prisoners' lives, including early release time credits, the possibility of parole,

28  and release from custody, there were no allegations supporting that ADCRR prisoners in

private prisons are not afforded any process to challenge those write ups, and Plaintiffs allegations did not reach the level of outright disqualification from parole consideration as in *Wilkinson*.  (*Id*. at 21.)  Plaintiffs have now added an allegation that any oversight by ADCRR in the write-up process is not meaningful and the ability to challenge a write up or its consequences is also not meaningful.  The Court must accept this allegation as true, despite Defendant's assertion that prisoners can challenge disciplinary write-ups.  This could support a facial challenge to the statute, but it is insufficient to support an as-applied challenge because neither prisoner Plaintiff alleges they have been subject to write ups or have not had a meaningful opportunity to challenge the write ups.

Because the Court has determined that Plaintiffs have alleged, at best, an as-applied challenge to the privatization statutes, and because they have not alleged they have been subject to the conditions alleged in the FAC, such as the inability to challenge write ups, Plaintiffs have failed to state a Fourteenth Amendment procedural due process claim.

## F.    Count Four (Thirteenth Amendment)

Plaintiffs allege the following in Count Four.  Defendant has violated the Thirteenth Amendment by transferring and assigning prisoners to private prisons and thus "granting private interests dominion over the prisoners and the fruits of prisoners' economic value and labor, thus rendering such prisoners, including Plaintiffs and the class members, as slaves to the Private Prison Corporations," and by treating prisoners as fungible assets and commodities whereby any prisoner can be substituted for another prisoner and generate the same revenues and profits for the corporation.  (Doc. 38 ¶¶ 234, 236.)  Arizona laws authorizing and/or requiring prison privatization "create a form of slavery by which the incarceration of the many, including Plaintiffs, enriches the few private interests in violation of the Thirteenth Amendment."  (*Id*. ¶ 235.)  "These actions perpetuate slavery and the abuse of prisoners' liberty to extract financial gain for private interests, some of those gains in turn become political campaign contributions to those elected officials who support prison privatization."  (*Id*. ¶ 236.)  ADCRR's use of private for-profit prisons violates the Thirteenth Amendment's prohibition of slavery and involuntary servitude, and

the private prison corporations "require prisoners to perform a variety of labor, depending on the facility, sometimes with the threat of incident reports for failure to comply. A court sentence, ADCRR placement, and private prison work dictated to prisoners (including the requirements to perform janitorial services) mirrors the post-Civil War slavery and quasi-slavery — i.e., convict leasing and convict peonage systems in the South." (*Id.* ¶¶ 239-241.) Alternatively, ADCRR's use of private prisons violates the Thirteenth Amendment's "punishment clause," which only permits punishment by government. (*Id.* ¶ 242.)

Plaintiffs further allege that private prisons bear many similarities to historic slavery, and their origins can be traced to historic slavery. (*Id.* ¶ 140.) Prior to enactment of the Thirteenth Amendment, the terms "slavery" and "slaves" were not limited to forced labor of people from Africa and their descendants; the mere possession and control of slaves made slaves valuable property to those who captured slaves, transported them, and sold them. (*Id.* ¶¶ 141-144.) The slave traders extracted value from their slaves not through labor but by simply owning them and having possession of them as chattel property for purposes of sale, and by using them as assets for collateral for loans. (*Id.* ¶ 148.) Slavery in the United States was protected by law, and the Supreme Court protected slavery and the slave owner's legal right to his slave property in many cases, including *Dred Scott v. Sandford*, 60 U.S. 393 (1857). (*Id.* ¶ 150.) After adoption of the Thirteenth Amendment and into the Twentieth Century, the practices of actual slavery and quasi-slavery through convict leasing and peonage contracts thrived in parts of the former Confederacy, to the enrichment of private interests, and various southern states adopted "The Black Codes" that criminalized black life in order to control free blacks and to re-enslave them through the criminal justice system. (*Id.* ¶¶ 152-153.)

Private prisons are a relatively new phenomenon, beginning in force only in the 1980s, and now a number of states have moved to ban private prisons, including New York, Illinois, Iowa, Nevada, Washington, and California. (*Id.* ¶¶ 132-135.) Numerous religious groups have adopted resolutions denouncing private prisons and resolutions issued by the United Methodist Church, the Presbyterian Church, the U.S. Conference of Catholic

Bishops the Episcopal Church, and the Unitarian Universalist Association, and there have been statements from the American Bar Association, the American Correctional Officer Intelligence Network, the National Association of Criminal Defense Lawyers, the Japanese Americans Citizens League, and the NAACP.  (*Id.* ¶ 138.)

### 1. Legal Standard

The Thirteenth Amendment provides, in relevant part, that "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1.  Following its enactment, the Supreme Court held that although the Thirteenth Amendment was "intended primarily to abolish African slavery, . . . the use of the word 'servitude' is intended to prohibit all forms of involuntary slavery of whatever class or name."  *Slaughter-House Cases*, 83 U.S. 36, 37 (1872).  More recently, the Supreme Court again recognized the primary purpose of the Thirteenth Amendment "was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase 'involuntary servitude' was intended to extend 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.'"  *United States v. Kozminski*, 487 U.S. 931, 942 (1988) (quoting *Butler v. Perry,* 240 U.S. 328, 332 (1916)) (upholding the criminal conviction of farm operators who used physical coercion to keep two mentally retarded men laboring on their dairy farm for no pay).  But, "[b]y its terms [the Thirteenth] Amendment excludes involuntary servitude imposed as legal punishment for a crime."  *Id.* at 943 (defining "involuntary servitude" in the context of two criminal statutes as "servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process") *superseded on other grounds by* 22 U.S.C.A. § 7101.

. . . .

. . . .

- 33 -

1          **2.     Discussion**

2          Defendant argues that Plaintiffs have still not provided any legal authority for the

3    proposition that confinement in a privately operated facility violates the Thirteenth

4    Amendment and, although Plaintiffs now allege that prisoners in private prisons, depending

5    on the facility, are required to perform a variety of labor, such as janitorial services,

6    Plaintiffs do not allege they were forced to perform labor, making their allegations

7    conclusory and equivocal.  (Doc. 41 at 7.)  Defendant contends that independent of the

8    privatization statutes, Arizona law authorizes ADCRR to require prisoners to perform

9    labor, and Plaintiffs do not challenge those statutes.  (*Id*., citing Ariz. Rev. Stat. §§ 31-251,

10   31, 252, 31-253, 41-1624.01.)  Defendant argues that Plaintiff's allegation that not every

11   facility engages in "involuntary servitude" destroys their facial challenge, and their failure

12   to allege that they are subjected to involuntary servitude destroys their as-applied

13   challenge.  (*Id*. at 8.)

14         Plaintiffs respond that the text of the Thirteenth Amendment is ambiguous as to

15   whether the Punishment Clause modifies the entire clause "neither slavery nor involuntary

16   servitude" or just "involuntary servitude."  (Doc. 49 at 22.)  Plaintiffs argue the better

17   reading is the more limited one in which "punishment" applies only to involuntary

18   servitude and the prohibition on slavery is absolute.  (*Id.*)  Plaintiffs argue that the FAC "is

19   replete with allegations and descriptions of traditional slavery that did not rely on labor"

20   and that "traditional understandings of slavery have never relied exclusively on compelled

21   labor, a fact that the drafters of the Thirteenth Amendment were surely aware . . . ."  (*Id*. at

22   17.)  They contend that prisoners have been effectively transformed into property and are

23   valued only in terms of their "compensated man days," which mirror practices of chattel

24   slavery that the drafters of the Thirteenth Amendment targeted for abolition.  (*Id*. at 19.)

25   Plaintiffs cite to Justice Harlan's dissent in *Robertson v. Baldwin*, in which he wrote:

26   "Slavery exists wherever the law recognizes a right of property in a human being, but

27   slavery cannot exist in any form within the United States.  The Thirteenth Amendment

28

1    uprooted slavery as it once existed in this county and destroyed all of its badges and

2    incidents.  It established freedom for all."  165 U.S. 275, 292 (1897).

3           Plaintiffs argue that the Thirteenth Amendment's Punishment Clause applies only

4    when someone is intentionally sentenced to government-imposed incarceration, and it does

5    not permit them to be subjugated to the control of private entities for purposes of turning a

6    profit.  (Doc. 49 at 20-21.)  Plaintiffs cite to the statements of Representatives Thaddeus

7    Stevens and John Kasson shortly after passage of the Thirteenth Argument arguing that the

8    Punishment Clause "would create a loophole which swallowed the amendment" if it

9    allowed individuals convicted of crimes to be confined under private, not state, control.

10   (*Id.*)

11          As in their Response to Defendant's First Motion to Dismiss, Plaintiffs again cite

12   the Fifth Circuit case finding that "a prisoner who is not sentenced to hard labor retains his

13   thirteenth amendment rights" and may attempt to prove a Thirteenth Amendment violation

14   by showing "he was subjected to involuntary servitude or slavery."  *Watson v. Graves*, 909

15   F.2d 1549, 1552 (5th Cir. 1990) (holding that the plaintiffs were not subjected to

16   involuntary servitude where they requested to work outside the jail).  And Plaintiffs again

17   cite a Tenth Circuit case involving a challenge to private prisons that noted "there might

18   be circumstances in which the opportunity for private exploitation and/or lack of adequate

19   state safeguards could take a case outside the ambit of Thirteenth Amendment's state

20   imprisonment exception."  *Davis v. Hudson*, 221 F.3d 1351, 2000 WL 1089510, at *3 (10th

21   Cir. 2000) (unpublished) (finding that the complaint contained no such allegations and

22   citing the Wisconsin statute that required private prisons to adhere to the "same standards

23   of reasonable and humane care as the prisoners would receive in an appropriate Wisconsin

24   institution").

25          Plaintiffs contend that the lack of controlling authority on the Thirteenth

26   Amendment issue "is only more reason not to dismiss the Amended Complaint" and their

27   new allegations "demonstrate that factual development [] is warranted."  (*Id.* at 18.)

28   Plaintiffs cite to *McGary v. City of Portland*, which found that Rule 12(b)(6) dismissals

"are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development."  386 F.3d 1259, 1270 (9th Cir. 2004) (internal citation and quotation omitted).  The court in *McGary* further noted that "'[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" ).

Defendant replies that beginning in 2007, the Supreme Court jettisoned the pleading standard applied in *McGary*, which encouraged discovery so a plaintiff could explore whether there were facts to support a claim, for the more stringent standards in *Twombly*, and *Iqbal*.  (Doc. 75 at 4.)

The standard applied in *McGary* only allowed dismissal of a complaint "if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *McGary*, 386 F.3d at 1261 (citing *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002)).  In the subsequent *Twombly* case, the Supreme Court observed that under the "no set of facts" standard, "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561 (citing *Conley v. Gibson*, 355 U.S. 41 (1957)).  Following *Twombly*, the Supreme Court in *Iqbal* held that while Rule 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, [] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

Plaintiffs have now clarified that they are not only relying on the Thirteenth Amendment's abolition of involuntary servitude but also on the broader abolition of slavery, which includes the rendering of human beings as property, able to be bought and sold.  As far as this Court is aware, this is a matter of first impression.  Nevertheless,

Plaintiffs' Thirteenth Amendment theory continues to fail to state a claim. Plaintiffs have not cited, and the Court has not located, any authority for the proposition that confinement in a private prison violates the Thirteenth Amendment's prohibition against slavery or involuntary servitude. Nor have the prisoner Plaintiffs alleged any facts showing that they are forced to perform labor analogous to traditional notions of slavery or involuntary servitude. While Plaintiffs do allege that their confinement in private prisons renders them commodities akin to formerly enslaved people in the United States or those incarcerated in Nineteenth Century slave jails, the Court is still unaware of any authority finding that such confinement violates the Thirteenth Amendment. As such, Plaintiffs have failed to state a Thirteenth Amendment claim and the Court will dismiss Count Four.

### G. Count Five (Eighth Amendment)

Plaintiffs allege that treating them as property and subjecting them to jailers that profit from incarceration and have disincentives to see Plaintiffs released "is analogous to slave jails before the Thirteenth Amendment, is both cruel and unusual, and violates each Plaintiff's human dignity," in violation of the Eighth Amendment. (Doc. 38 ¶ 247.)

#### 1. Legal Standard

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Thus, "'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). While "[t]he Constitution 'does not mandate comfortable prisons,' [] neither does it permit inhumane ones . . . ." *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *see also Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) ("The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement."). The Eighth Amendment places restraints on prison officials by, for example, prohibiting the use of excessive physical force, and it "imposes duties on these

officials, who must," for example, "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832-33 (internal quotations and citations omitted).

To state an Eighth Amendment conditions-of-confinement claim, plaintiffs must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

## 2. Discussion

Defendant argues that Plaintiffs' FAC does not include any plausible factual allegations of excessive force, lack of safety, or the provision of food, clothing, shelter, or medical care that fall below constitutional minimums at any of the privately operated facilities in Arizona. (Doc. 41 at 9.) Defendant contends that the new allegations pertaining to the *Parsons* class action and the provision of medical care in state-run prisons is irrelevant because that litigation involves only state-operated facilities. (*Id.*, citing Doc. 38 ¶¶ 24-32.)[7] Defendant further argues that Plaintiffs' citation of the 2016 OIG report is also irrelevant because it did not review any of the privately operated facilities in Arizona. (*Id.*, citing Doc. 38 ¶ 122 and Doc. 38-5 at 10-12.) Plaintiffs' other allegations referencing lack of safety and food, Defendant contends, are speculative and conclusory and do not support that Plaintiffs are being deprived of the minimal civilized measure of life's

---

[7] Plaintiffs cited the class action by Arizona prisoners in *Parsons v. Ryan*, which alleged Eighth Amendment violations in the provision of healthcare to ADCRR prisoners after ADCRR delegated healthcare to a private company. (Doc. 38 ¶¶ 24-32.)

1   necessities or are exposed to a substantial risk of serious harm.  (*Id*.)  Lastly, Defendant

2   argues that Plaintiffs' failure to allege they are being exposed to unconstitutional conditions

3   destroys their as-applied challenge to the privatization statute, making the requested

4   remedy of invalidating the statute inappropriate.  (*Id*. at 9-10.)

5         Plaintiffs' short response on the Eighth Amendment claim points to their allegations

6   that private prisons are a relatively new phenomenon, beginning in force only in the 1980s,

7   that an increasing number of states have moved to ban private prisons, and numerous

8   groups have adopted resolutions denouncing private prisons.  (Doc. 49 at 29, citing Doc.

9   38 ¶¶ 132-136 and Exs. F and G.)  Plaintiffs also point to their allegation that "Modern

10  understandings of human rights recognize that treating plaintiffs as property, and

11  subjecting plaintiffs to jailers that profit from incarceration and that have disincentives to

12  see plaintiffs released is analogous to slave jails . . . is both cruel and unusual, and violates

13  each plaintiff's human dignity."  (*Id*., citing Doc. 38 ¶ 247.)

14        Plaintiffs do not point to any specific allegations of Eighth Amendment harm in the

15  Arizona private prisons, and the Court has not located any specific allegations of the use

16  of excessive force, lack of safety, or the denial of adequate food, clothing, shelter, or

17  medical care that would constitute the denial of "the minimal civilized measure of life's

18  necessities" within the private prisons in Arizona.  *Farmer*, 511 U.S. at 834.  Instead, the

19  Complaint appears to speculate that these Eighth Amendment violations could occur as the

20  result of cost cutting measures taken to increase profits.

21        As discussed in the previous Order, the cases Plaintiffs cite are not particularly

22  helpful because, while they do state that the Eighth Amendment is subject to evolving

23  standards, the issues in those cases did not involve the constitutionality of private prisons

24  or whether their use violates the Eighth Amendment.  For example, in *Graham*, the

25  Supreme Court held that the Eighth Amendment prohibits the imposition of a sentence of

26  life without parole on a juvenile offender for a nonhomicide crime.  *Graham v. Florida*,

27  560 U.S. 48, 58 (2010).  *Roper* held that the Eighth and Fourteenth Amendments prohibit

28  the execution of individuals under the age of 18 at the time of their capital crimes.  *Roper*

*v. Simmons*, 543 U.S. 551, 578 (2005).  *Atkins* held that the Eighth Amendment prohibited the execution of mentally retarded individuals.  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  And *Brown* involved prisoners with serious mental and medical conditions who alleged they received inadequate health care due to prison overcrowding.  *Brown v. Plata*, 563 U.S. 493, 499-500 (2011).

In the absence of any authority holding that the use of private prisons violates prisoners' Eighth Amendment rights, or allegations of specific Eighth Amendment violations resulting from their placement in these private prisons, Plaintiffs have failed to state an Eighth Amendment claim, and the Court will dismiss Count Five.

**IT IS ORDERED**:

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion to Dismiss (Doc. 41) and the Motion is **granted**.

(2)     This action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 28th day of January, 2022.

_____
Douglas L. Rayes
United States District Judge